This ought to go without saying, but unfortunately the manner in which this case reaches this court requires repetition that immunity is presumed in the law, it is the plainest burden to disprove it, and as this court has observed, the Supreme Court repeatedly reminds the lower courts of that axiom. This case is one in which the district court neither analyzed whether there was a constitutional violation or the second element of qualified immunity, that is, whether the alleged violation or the potentially found violation violates clearly established law. Isn't there an even more basic problem, which is you're only representing Constable Heap, right? Yes, Your Honor. He wasn't there. I'm sorry, sir? I mean, Heap wasn't, it was a traffic stop. He was back at headquarters or on vacation for all, I mean, who knows where he was. He wasn't on the road at the traffic stop, side of the road. He was with his dad. I mean, we get these cases all the time, of course, traffic stop, excessive force allegations. People, you can't just sue the police chief absent some training theory. I mean, right? I mean, there's no vicarious, so why are we even worried if it was a lawful stop if Heap wasn't there? It's an excellent question, Judge, and the only place I'd quarrel with you is in fact Constable Heap was home in bed. But be that as it may, your point is well taken. And I'll be candid with the court in telling you that I've struggled with the order in which to address this case because Your Honor is 100% correct that there is a complete lack of the requisite personal involvement in the alleged constitutional violation, which on its own should have resulted in the prompt dismissal of the law enforcement supervisor who the plaintiff's own pleadings demonstrate was not present at the scene or otherwise involved. So Your Honor has now suggested to me the appropriate order, so let me follow your lead. It is right Heap wasn't there. I mean, there are some allegations Heap directed. I don't know if there's any – we can ask the opposing counsel what the basis for that is. But I didn't see the complaint. It says Heap orchestrated some conspiracy, but that seems – I don't see any specific facts to show that. And I will speak to that, Judge. But again, let me pick up on the personal involvement aspect first, as the court just suggested. The appellee's own pleadings at 67, Record 67, demonstrate that even appellee acknowledges that Constable Heap was not present at the location of the stop and investigation. A video, which is Record 63, demonstrates as well. Now, to Judge Costa's point, there is an allegation of, quote, information and belief that Constable Heap directed the deputies to stop the appellee. Now, personally, I would have thought that the Twombly-Iqbal pleading standard would have largely done away with the concept of information and belief, which respectfully I don't assert to my friend but just generally is I wish it were so or I hope to be able to prove it one day. Those seem to run directly in opposite to the Supreme Court's holdings in Twombly and Iqbal. But focusing particularly on Iqbal's pleading standard because it is an immunity case, if there is a mechanism by which one can assert information and belief as necessary to overcome the presumption of immunity, Iqbal and Twombly certainly demonstrate that there must be some factual underpinning to the alleged information and belief. Here there is none. It is simply ipsa dixit or conclusorily stated that the appellee believes Constable Heap directed the stop. To be sure, and I'll get to this when I turn to the second element, however, Constable Heap would still be immune even if he did tell the deputies to stop the vehicle because there was reasonable suspicion at the very least to conduct a Terry stop, which is what the video evidence shows this was, and probably probable cause to arrest the appellee for what even he admits he did. This is very much like the case of Tarver versus the city of Edna in which this court found that the chief of police, Chief Kreider, directed Officer Bubella to arrest Mr. Tarver, but having found that there was probable cause for the arrest, this court reversed and rendered judgment in favor of Chief Kreider based upon immunity. So unless it could be argued and demonstrated from the pleadings that no reasonable officer could have believed that at least grounds for a Terry stop, let alone for an arrest, were present based upon the citizen complaint and the appellee's own pleading admissions, then even if the court were to credit the information and belief argument that Constable Heap had something to do with the stop itself, it would still be a constitutional stop and not actionable against Constable Heap. The other fallback, and this may be in answer to your other point, Judge Costa, is the time-worn and almost never-availing argument of inadequate training. And the problem with that allegation is it can't be determined after the fact. That is, the allegation that I shouldn't have been stopped, therefore the officers must not have been trained adequately finds no foothold in constitutional law. First of all, this court has repeatedly held that TECOL, the Texas Commission on Law Enforcement and Education Training, which is mandated of all officers, is constitutionally sufficient under City of Canton v. Harris. So to the extent that Constable Heap would say, I believe TECOL establishes the basic minimum requirements for constitutional training, he would find favor in a number of cases from this court, all of which are cited at page 26 of the brief. But even if the argument were that that training was inadequate, there would have to be factual allegations of a known need for additional training that precedes this event, and then factual allegations of a conscious disregard of a known or obvious consequence of failing to provide that training, and that's the Valley v. Houston case, although this court has many of those cases, as Judge Costa observes. That one's cited at page 23 of the brief. Now, the personal involvement, again, I think should have been a clear signal to the trial court to go ahead and dismiss Constable Heap, just as Judge Costa has already suggested. But even if the trial court was inclined to analyze whether the plaintiff has – the appellee has stated a constitutional claim, that itself would have led to dismissal. It's undisputed that there was a citizen complaint. In fact, the appellee admits that, which supports an investigatory stop under the law. The fact that the appellee turned out to be a law enforcement officer, facts which the deputies could not have known at the time that they made the stop, is immaterial. Indeed, the appellee's own admissions demonstrate he may have been in violation of other Texas laws that apply only to law enforcement officers. The Texas Transportation Code provision, which prohibits law enforcement for traffic violations without displaying a badge, and the Texas Transportation Code, which prohibits an unmarked law enforcement vehicle from conducting traffic operations. Now, the fact that this was a – that it was a Terry stop is clearly supported by the allegations and the appellee's own admissions. I would posit that this – the information that was provided would have warranted an arrest, but we don't have to get to that because there was no arrest here. The undisputed allegations and the video which support it demonstrate that the appellee was detained for a few minutes, and he was handcuffed for one minute and 47 seconds. He was also the subject of a felony stop. This court has made clear that the use of a firearm in a felony stop situation based upon the allegation or the information that an individual may be armed is prudent. It may even reduce the need for additional force. That's the Hinojosa v. Terrell case cited at page 19 of the brief in which this court said doing so may actually have the effect of decreasing violence. We know as a matter of law this court determined on Bonk and Dunn v. Dank in 1996 cited at page 18 of the brief that handcuffing is simply not excessive force, yet the appellee makes that very same argument. By the way, this court held an accord in Tarver v. Edna, which I've already pointed out. There was arguable probable cause to arrest, and there are no allegations of any of the elements of a claim of excessive force. No injury, no injury caused directly and only by a use of force clearly excessive to the need, and no allegations that the excessiveness of any force was clearly unreasonable. Now, even if the court might be able to glean some kind of a potential constitutional violation out of this action and some kind of personal involvement, neither of which the district court identified. The district court identified questions, no answers. Still, the constable Heap is entitled to dismissal on the second element of immunity, which is that the appellee nor the trial court identified any clearly established law that would have put constable Heap on notice that anything he supposedly did was unconstitutional. This court, Judge Oldham writing for the court, called that a doozy of a burden, as the court may recall. And here, neither the appellee nor the trial court identified any clearly established law, which would have told constable Heap or a reasonably similarly situated law enforcement supervisor that anything he was doing was unconstitutional. I have a question just about the complaint. Yes, Judge. Was the call – does the complaint reveal whether the call that someone was waving a gun and trying to turn on the lights – was that caller anonymous or did the caller identify himself? The caller was identified, Your Honor. Do you know where in the complaint – I mean, it's a lengthy complaint. I don't know where it is in the complaint, Judge. But you think it's in the complaint that it says that, not just your knowledge of the case? I may have misunderstood your question. I do not know if the complaint identifies the caller. I happen to know as a matter of fact that the caller was – So you don't know the complaint yet? If, Your Honor, the question was whether it's in the complaint, I think the answer may be no. That's what we know right now. Lastly, I should point out that in addition to the qualified immunity as to constitutional claims, the district court was required to grant dismissal on the common law claims against Constable Heap under Section 101.106F of the Tort Claims Act. Counsel, just to be clear, is anything relating to the press conference relate back to the 1983 claims or is that all under the state law claims? That claim is a defamation claim under state law to my understanding of the complaint. I don't think that there's a 1983 claim for that – for those statements. So that would be – I mean, back to Judge Costa's original question. The press conference is the only thing that Constable Heap actually participated in himself. In the complaint, that's the only clear allegation of personal involvement. Yes, Your Honor. But it's barred by 101.106F of the Texas Tort Claims Act. As this court observed in Wilkerson v. University of North Texas, which is cited at 878 F. 3rd. 147, Judge Smith was on that panel. The facts are actually quite similar in that I believe one of the allegations against the university officials, which this court found could not be pursued under – in light of 101.106F was a claim of defamation. There's no question to answer Judge Wilson's question to me. There's no question from the pleadings that the allegation is that Constable Heap used his office to make these – to conduct the press conference and make what the Pele complained were inappropriate comments. And that being the case, in light of this court's opinion in Wilkerson v. University of North Texas and the subsequent Supreme Court opinion from the state – the Texas Supreme Court opinion in Garza v. Harrison, it's clear that Constable Heap's allegations – sorry, the allegations against Constable Heap related to that press conference fall within the preclusion of 101.106F. Lastly, while I don't think this court will reach it, if there was a need for discovery, it was incumbent consistent with Bakke v. LeBlanc for the trial court to identify the specific narrow facts on which the court required discovery to resolve the question of immunity. But I think it's quite clear from the order and from the plaintiff – the appellee's complaint itself that just like in Bakke v. LeBlanc, the trial judge here, who was the same trial judge in Bakke, has once again doubly erred in failing to resolve the question of immunity on the pleadings and also in allowing discovery to proceed on – without narrowly tailoring it to some specific need. Thank you. I'll reserve my time for rebuttal. Yes, Mr. Howe, can you save time for rebuttal? Mr. Scott? Busy week for you. Yes. May it please the court. Southern District of Texas Chief Judge Lee Rosenthal stated the uncontroversial proposition that a police officer has a constitutional right to be free from excessive force. But the issue is whether the actor should have known that the suspect was a fellow officer. Appellant's counsel stated that the deputies – in his brief, he stated that the deputies used minimum force and that probable cause existed for an arrest. Your Honors, I ask you, how much force should be used against a uniformed police officer? Everyone here knows the answer to that question. The answer is none. So why did this happen? That's what we intend to find out. Before stopping Constable Smith, the deputy constables clearly saw that his vehicle was marked, displayed exempt license plates, and was equipped with police lights. This was the first opportunity for the deputies to realize that the use of force would be objectively unnecessary. Nevertheless, the deputies drew their loaded weapons, approached Constable Smith's vehicle, and pointed the loaded weapons at him. The use of force was objectively unreasonable at this point. But he had been reported to have pointed a gun at a motorist. The motorist reported that someone in a vehicle pointed a gun at him. So that had been reported. My argument is that once the deputies saw that the vehicle was a marked police vehicle with police lights, that should tell the deputies that, hey, this is a peace officer. There's a peace officer inside this vehicle. Well, he can't make a traffic stop outside his own county, right? That is true. Constable Smith cannot make a traffic stop outside his own county yet. So he's pointing a gun at a motorist. Are you saying that that's okay? That he's exempt from being even pulled over for that? I don't understand. No, Your Honor, that's not what I'm saying. First, Constable Smith denies pointing the gun. And I know for the purpose of the stop, that's beside the point. Your Honor, to your point, our allegation is that even before the stop, even before the stop, they knew that this was Constable Smith because he was under surveillance. He was under previous surveillance. Why was he under surveillance? Your Honor, he was under surveillance. These two constables have a history. Their jurisdictions share a common border. They have to cooperate with each other. This is Northwest Harris County where Waller County is, right? Yes. And there's been friction in the past between these two jurisdictions. So that, you know, we intend to conduct discovery to find out more about this. But, you know, there's friction. So we believe that at the moment they saw him, they knew who he was. And no, they did not believe that Constable Smith pointed a weapon at this guy. There was friction that caused him to make the stop. But more things happened after the stop. So even if we assume that they had a right to make the stop, okay, I'd like to keep going because there's more. The history of this friction, though, is not detailed in the complaint, is it? I know there's references to it, but there's no details about it. There's no detail, Your Honor. There's no detail. We intended to conduct discovery to get more detailed facts. When Constable Smith exited his vehicle, he was wearing his official uniform, displaying his badge and name tag. Under Texas Penal Code 22.01d, the deputies were presumed to have known that Constable Smith was a public servant since he was wearing his uniform and badge indicating his status as a peace officer. Constable Smith had his hands held in the air. He was not wearing a service weapon and he was obeying all commands. This was the second opportunity for the deputies to realize that there was, you know, it was objectively unnecessary for them to have to use force against Constable Smith. Even still, the deputy constables continued to aim their loaded weapons at him and instructed him to walk forward. Upon exiting his vehicle, Constable Smith verbally informed the deputies that he was the elected constable of Waller County, Texas, Precinct 3. This verbal identification, together with the other objective indications of Constable Smith's peace officer status, should have led the deputies to objectively conclude that force would be unnecessary. Instead, the deputies handcuffed him and attempted to place him in a police vehicle. Well, he refused that though. He was following all commands when he didn't follow the command to get in the police vehicle. Your Honor, at that point he determined that it was an unlawful arrest and he asked the deputies to call Constable Heath. He was afraid for his life. He did not want to get in the back of a police vehicle. He was afraid for his life because under his judgment, the force was unnecessary. They did not have the right to arrest him and place him in a police vehicle. Well, but his views or his impressions of what was going on doesn't really, I mean, those aren't really relevant as to what those officers perceived or reasonably perceived at the time. In other words, for qualified immunity, we're looking at what the officers perceived in terms of whether they violated any constitutional rights of Mr. Smith, right, or Constable Smith. In other words, what he thought or perceived was going on is less relevant than what they thought in terms of their reasonable suspicion to conduct a Terry stop and then what they did thereafter in terms of controlling the premises. Correct Your Honor, I agree with you that he did not, he did not obey the command to get into the police car. However, you know, their reasonable suspicion and any force that they used, there has to be a need for it. Our argument is that from the time they made the stop to the time they tried to place him in the police vehicle, and they saw that he was a peace officer, there was no need for force. There was no need for pointing loaded weapons at him. There was no need to handcuff him. There was no need to place him in a police vehicle. This was a class A misdemeanor that if we assume that their allegations are true about the pointing the weapon, that's a class A misdemeanor, deadly conduct. And the constables did not witness that. So they have the information from, they have information from a caller that someone pointed a gun at them. But when they arrived, they see that it's a peace officer. They did not witness him waving the gun. You can arrest and handcuff someone for a misdemeanor. That's the Atwater case. A lot of people don't like that rule, but that's what the Supreme Court said. Well, in Atwater, you know, in the Fifth Circuit opinion from Atwater, if, you know, I believe that was a seat belt. That involved a seat belt. Well, the officer witnessed it. The officer witnessed the driver riding without a seat belt. This officer did not witness the misdemeanor. So if the officer witnesses it, a warrantless arrest is fine. But if he does not witness a misdemeanor committed, then, you know, he has no— Well, that goes to the probable cause, I guess. But not—I thought you were trying to say because it was just a misdemeanor, there's no, you know, basis to handcuff and that sort of thing. Well, no. What I'm saying is that there's no basis to point loaded weapons, and there's no basis for handcuffing because he's not armed. He's a peace officer. He's not armed. The police officer's safety is not in question. He's not attempting to flee. Going through the sequence of events, you said they called off—they called Constable Heap. And then what happened? Well, at that point, they released him. Did Heap get on the phone? Did they actually talk to Heap? They talked to him. And so Heap apparently said, let him go. So how's that consistent with Heap being behind a big conspiracy to get your client? Okay, well, you know, I didn't—we didn't use the term big conspiracy, but we believe it was out of personal—out of personal animus. Okay, so then why once they actually talked to Heap, Heap's—I mean, Heap's—this is a vendetta. Heap would say, do something to him. Take him down to the jail. Okay, well, at that point, he had accomplished his purpose. He stopped him, handcuffed him. They have loaded weapons pointed at him, one being a high-powered rifle. You've intimidated him. The guy's scared. He's even—he's even disobeying officers to get into the car because he's scared for his life. You have intimidated him at that point. You sent your message that, hey, stay in your place. You know, you—it's accomplished. Counsel, where's your—where's your case law that holds Heap accountable for any of this? Because he wasn't there. I mean, back to Tuts Costa's initial question about this case. Right. How is any of this, you've argued, in terms of the sequence of events attributable to Heap? To—to impute personal involvement, we relied on the statement at the press conference that Constable Heap held, where he stated that he reviewed the tape, he knew all the information, and he did not see anything wrong with his deputy's actions. Where's your case law that clearly establishes that? In my—in the brief, we cited Brown v. Byer for the proposition that if the constable ratified, you know, direct personal involvement isn't necessary unless the actor personally ratified the conduct of the deputies. For an excessive force claim. Well, I don't know that—I don't know that that applies directly to an excessive force claim, but it does, you know, it does stand for the proposition of ratification that an official can be held individually liable if he ratified the unlawful acts of his deputies. It will edge that the deputies used excessive force. Constable Heap had that information. He saw the—he saw the incident. He had all the information, so, you know, he could tell it was excessive force, but then he ratified the acts of the deputies by saying publicly that nothing was wrong with what they did. So, we allege that that's ratification, and if, you know, and if the jury finds that that is ratification, he can be held individually liable, and he wouldn't be— Yes, but that has to be—to survive qualified immunity, that has to—that has to be clearly established in the law that he can be held for his deputy's actions even though he wasn't there. Well, but he—well, it is in the law that says he doesn't have to be there if he ratifies it after the fact. So, he does not have to be there. Yeah, I don't know what else to say. He does not have to personally be there if he ratifies their conduct. But let's get back to the excessive force. So, we have a report from a citizen that someone is pointing a gun at a motorist and flashing his lights at a motorist, and the officers stop that person. Now, whether the person they stop actually pointed a gun or not, the officers have the report, which they would have the duty certainly to make some kind of an inquiry, so they make the stop. And still thinking that there was a citizen report of someone pointing a gun, I mean, why doesn't that justify at least an effort to handcuff for a minute and 47 seconds to make some kind of investigation, particularly since they did, in fact, find a service weapon inside his vehicle? So, I guess what I'm getting at—this is a long-winded question. I'll give you a chance to answer. So, when he sees the video of all that, what is he going to say was wrong with it? Well, Your Honor, we believe that once the deputy sees that this is a uniformed peace officer, of course they're going to find a service revolver. They know it's a service revolver in the car before they even make the stop, because if it's a peace officer, he has a weapon. But when he exited the vehicle, he didn't have a service revolver on. They asked him where his service revolver was. That's alleged. They asked him where it was. He told them where it was. He was not armed. So, at that point, Your Honor, we see no point for—we see no point for the weapons men pointing at him once they know that this is a peace officer and he's cooperating and the service weapon is in the car. He doesn't even have it on him. His hand's in the air. So, yes, they could ask anything they want, but we don't think that there's any need for them to have loaded weapons pointed at a uniformed peace officer. And then after they know he's not armed, to handcuff him. Your Honor, Constable Smith believes that this was a racial incident, that they shared a border. They had to cooperate with each other. They had to treat each other as equals. This was he sending a message and, you know, and handcuffing him. We do not think that this was his judgment being used by a deputy constable. He's a uniformed peace officer. At all relevant times, Constable Smith alleges that he had committed no crime. He denies waving the gun at the motorist. If he allegedly did commit a crime, the offense was daily conduct, a Class A misdemeanor. He did not pose an immediate threat to the officers or others. Again, he was a uniformed peace officer. The force used against him by the deputy constables was excessive and unreasonable. Again, there was no point for loaded weapons to be pointed at him. At different points in the process, there was no justification for handcuffing him when you knew there was no threat. They could have asked him anything they wanted. The appellee was not actively resisting arrest or attempting to evade arrest by flight. And although Constable Heap was not present at the scene, the factual allegations support a finding of his individual liability. The appellee alleges that he personally directed his deputies to conduct the arrest in this manner, which could have resulted in his death. It should have never happened. He then held a news conference at which he referred to the appellee as a criminal suspect, and he ratified the deputy's conduct. Also, Constable Heap was statutorily responsible for his deputy's official acts. Constable Smith sufficiently pled a Section 1983 excessive force claim against Constable Heap in his individual capacity. Constable Smith alleged that he was seized. He alleged that he suffered psychological injuries. The psychological injuries resulted directly and only from the deputy's use of force that was excessive to the need. The force was objectively unreasonable since Constable Smith was driving a marked police vehicle and Constable Smith was wearing his official uniform. Constable Heap is not entitled to qualified immunity. Counsel, at a minimum, I'm going to stop you right there. How are we to treat the district court's opinion? There's no analysis of qualified immunity whatsoever in the order. I mean, wouldn't we at a minimum have to remand it for that analysis to be done? Because I just don't see it in the denial of the motion to dismiss. You said how are you to treat the district court's order? Yes, there's no analysis of qualified immunity at all in denying the motion to dismiss unless I'm misreading the order. What is your position as to how we're to address that issue? Well, if I remember correctly, I think the district court said that they needed more information. I think the district court's intent was to allow the parties to conduct some more discovery on that issue. I don't think the district court even mentioned qualified immunity. In other words, the order to me feels like a motion to dismiss order. I think they've alleged enough and therefore there's enough to proceed on into discovery, etc. There's no analysis though of qualified immunity. Your Honor, I'm going to have to rely on my brief for that. My reading of the order was the judge's intent was to allow the parties to conduct discovery and reveal some more of the facts that related to qualified immunity. All right. Thank you, Mr. Scott. Nothing? No. I would respectfully urge this court to reject an argument that the objective standard under the Fourth Amendment for the stop, the alleged arrest, or the use of force turns on the identity of the person involved. That is a slippery slope from which we will never recover. And as someone who has defended law enforcement for over 30 years and has a history of law enforcement in my own background, it's arguably repugnant for the appellee to argue that his treatment should differ from any citizen who is accused of committing a crime. Now, the idea that the fact that he is the elected constable of any precinct anywhere has no bearing on the constitutional questions here. There was, and I think my friend acknowledges it, at the very least reasonable suspicion to make the stop. So that takes care of the Fourth Amendment apprehension and stop question. As for the use of force, appellee identifies no use of force. This court has held that pointing a gun at someone is not a use of force in violation of the Fourth Amendment as a matter of law. This court has held en banc as a matter of law, that the use of handcuffs is not a use of force as a matter of law. As for the allegation first advanced today, because it's not in the complaint, that the only injury is one of psychological or mental anguish injury, this court also rejected that en banc in Dunn v. Dank, holding that pure psychological injury standing alone is not the injury component necessary to state a claim under the Fourth Amendment for use of excessive force. There simply was no force used here in accordance with the well-established precedence of this court. What the deputies may have observed is not in any way attributable to Constable Heap, and I will apologize if I do not recall an allegation of ratification in the complaint anywhere. But if there were an allegation of ratification, it would be important to note that one, the district court, to Judge Wilson's point, did not address that in any way, shape, or form. And two, neither this court nor the Supreme Court have ever held that individual immunity can be vitiated or that there's a constitutional claim against an individual defendant based upon after-the-fact ratification. In fact, that's antithetical to the basis of supervisory liability, because supervisory liability, this court has said, is similar to governmental liability for a 1983 violation. One, it requires either personal involvement, we've now acknowledged that that was not here, or two, that the supervisor did something which by its operation was the moving force behind a constitutional violation. Obviously, after-the-fact condom could not have been a moving force of a constitutional violation. Lastly, to Judge Costa's question about Atwater v. Lago Vista, let me add to your consideration this court's decision in Fields v. the City of South Houston, in which this court held that state law requirements for on view of a misdemeanor arrest have no bearing on a Fourth Amendment question. But again, this is just a Terry stop, so we don't get to that. And lastly, Judge Wilson, if you'll allow me to answer the question you posed to my friend, what this court should do is what it has done, for example, in Bakke v. LeBlanc when cases reach this point. It should impose the immunity which is presumed in the law and relieve Constable Heap from the burden of continuing to litigate this matter by reversing and rendering judgment in his favor. Thank you for your time. All right, thank you, Mr. Elfin. Your case and all of today's cases are under submission and the court is in recess until 1 o'clock tomorrow.